# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

UNITED STATES OF AMERICA     )
                                     )
        v.                          )       CAUSE NO.: 1:13-CR-65-TLS
                                       )
CAMERON PATTERSON         )

## OPINION AND ORDER

This matter is before the Court on Defendant Cameron Patterson's Second Motion to Suppress [ECF No. 45], filed on March 12, 2014. The Defendant argues that he was subjected to an unlawful custodial interrogation in violation of the Fifth Amendment and requests that the Court suppress any statements made by the Defendant during the interrogation. The Government responds that there was no violation of the Defendant's constitutional rights because the Defendant was not in custody at the time of the interrogation. For the reasons set forth in this Opinion and Order, the Court will deny the Defendant's Motion.

## BACKGROUND

On May 29, 2013, the PNC Bank in Ossian, Indiana, was the victim of an armed robbery. On July 23, 2013, after the Defendant had been identified as a suspect, agents from the Federal Bureau of Investigation (FBI) interviewed the Defendant in their office in Fort Wayne, Indiana. By way of an Indictment filed on August 28, 2013, the Government charges that, on or about May 29, 2013, the Defendant committed armed bank robbery and assault with a dangerous weapon, and aiding and abetting, in violation of 18 U.S.C. §§ 2113(a) and (d) and 18 U.S.C. § 2. On March 12, 2014, the Defendant filed a Second[1] Motion to Suppress [ECF No. 45] and

---

[1] The Defendant filed a Motion to Withdraw [ECF No. 50] his First Motion to Suppress [ECF No. 32], which the Court granted in an April 28, 2014, Order [ECF No. 51].

requested an evidentiary hearing, which the Court conducted on August 18, 2014. The Defendant was present and represented by attorney Thomas N. O'Malley. The Government was represented by Assistant United States Attorney Daniel L. Bella. The Court granted the Defendant's motion to separate the witnesses. The Court heard testimony from FBI Special Agent Kelly Stewart ("Stewart") and Fort Wayne Police Department Detective and Task Force Officer Darrin Strayer ("Strayer"). Several exhibits were also admitted into the record. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs. The Defendant filed a Brief in Support of Motion to Suppress [ECF No. 67] on October 27, 2014, and requests that the Court suppress evidence that law enforcement officers obtained from him during the July 23, 2013, interview. The Government filed its Response on December 31, 2014. The Defendant filed his Reply on January 23, 2015. The matter is now fully briefed and ripe for ruling.

## FINDINGS OF FACT

The Court makes the following findings of fact based upon the evidence and testimony presented during the evidentiary hearing conducted by on August 18, 2014.

FBI Special Agent Stewart was assigned to investigate a bank robbery that occurred at the PNC Bank in Ossian, Indiana, on May 29, 2013. During the course of the investigation Stewart received information leading him to suspect that the Defendant was involved in the robbery. Stewart then provided task force officers with a list of addresses the Defendant was known to frequent.

On July 23, 2013, Task Force Officer Strayer went to check some of the addresses while driving a dark colored, unmarked van. Strayer observed an individual enter the residence at one

of the addresses, 4761 Holton Avenue, and also observed a white Dodge Magnum parked outside, which source information suggested might have been purchased with bank robbery proceeds. Strayer called Stewart and observed the individual—later identified as the Defendant—exit the house, reenter, then exit again and start walking northbound on Holton Avenue. Strayer performed spot checks to verify that the Defendant was still walking northbound on Holton Avenue while Stewart drove to the area in a green, unmarked Ford Taurus. Stewart was familiar with the Defendant based on photos from the Bureau of Motor Vehicles and an FBI database. Stewart reached the intersection of Holton and Oxford at the same time as the Defendant, and was able to positively identify the Defendant.

Holton Avenue is a one-way street, so Stewart and Strayer circled around the block while they formulated a plan to approach the Defendant. Stewart parked on the east side of Holton, just short of 3409, and Strayer parked on the west side of Holton on the other end of the residence. When the officers exited their vehicles, the Defendant was located in a driveway between 3409 and 3417 Holton. Stewart was wearing khakis with a collared shirt and dress shoes. Strayer was wearing shorts. Both officers were armed and had a holstered gun under their untucked shirts, so that they were not visible.

Strayer exited the vehicle first, identified himself as FBI, and asked the Defendant to show his hands two or three times. Strayer briefly lifted his shirt and placed his hand on his gun while Stewart came around the corner and displayed his FBI credentials to the Defendant. Stewart told the Defendant that his name kept coming up in an investigation. When the Defendant asked what the investigation was about, Stewart replied that he did not want to discuss the details in the driveway. Stewart asked the Defendant if he was willing to come to Stewart's office to further discuss the issue and clear his name. The Defendant said he was willing to talk

with Stewart and Strayer. They walked to the passenger side of Stewart's vehicle and Stewart asked the Defendant if he had any weapons and then said "[h]ey, just for officer safety reasons, let me just do a quick check." (Tr. 15–16.) The Defendant turned to place his hands on Stewart's vehicle and spread his legs, but Stewart told him not to do that, he did not want to "make a big scene out here". (Tr. 15–16, 102–03.) Stewart was trying to keep the "pickup" low key without alerting a whole lot of people. Stewart said "[d]on't do that. Just lift up your shirt so I could see your waistband." (Tr. 16.) The Defendant raised his shirt, Stewart did a quick pat down of his outer pockets, and then the Defendant lowered his shirt. As he opened the front passenger door for the Defendant, Stewart said "I just want to make sure you're voluntarily coming with us, correct?" (*Id.*) The Defendant said "'Oh yeah, that's fine,' or something to that effect." (*Id.*) The Defendant then entered the vehicle. The time elapsed from initial contact to the Defendant entering Stewart's vehicle was approximately three or four minutes.

Strayer did not want to leave his vehicle parked on Holton so they drove separately to nearby Irwin Elementary where Strayer parked his vehicle, then sat in the backseat of Stewart's car behind the Defendant. The three men engaged in small talk, discussing sports and other things, while they drove to the FBI office, which is located on the tenth floor of the First Source Bank building at 200 East Main Street. They entered through the public garage, parked in a reserved spot on the fourth floor, and took the public elevator up to the tenth floor. Upon exiting the elevator they walked down the hall past the law office that shares the floor until they reached the door to the FBI office, which is entered by swiping a card and punching a code. Upon entering the office, there is a conference room immediately to the left that can be entered by swiping an access card. The room contains a rectangular table with chairs around it and some other equipment located along two of its walls. The Defendant sat in the chair closest to the door

with the door located at his "two o'clock" position. Stewart sat in a chair on the far side of the table from the door, and Strayer sat near him at a corner of the table to take notes. Stewart testified that there was nothing between the Defendant and the door, and that the door has a regular handle which does not lock from the inside and can be exited at any time. Likewise, the outer door has a simple push bar to exit the FBI offices, and does not lock from the inside.

Stewart had told the Defendant he wanted to talk and give the Defendant an opportunity to clear his name, but Stewart testified that he was attempting to obtain incriminating statements from the Defendant, in which the Defendant would admit his guilt. Stewart began interviewing the Defendant about the PNC Bank robbery. Initially, the Defendant told an alibi story about his whereabouts during the robbery. Stewart then accused the Defendant of being involved in the robbery. Upon making that accusation, about half way through the interview, Stewart reassured the Defendant that he could talk freely, and was not going to be arrested that day. Although Stewart cannot recall the exact words he used, it was something to the effect of "[u]nless you tell me you murdered someone or something, that rose to that level of a crime, you're not going to be under arrest today." (Tr. 26.) The Defendant then proceeded to tell Stewart about his and his companions' roles in the robbery.

The Defendant said that he was at Darnell Bontempo's house that day, with Dante Travier and Freddie Church, Jr., and they talked about driving by the PNC Bank in Ossian, initially to check it out. The Defendant, Travier, and Church used Bontempo's van and drove to the bank. Once there, they decided to rob it. The three men entered the bank. The Defendant's job was to watch the door to ensure that no one left the bank. Travier had the gun. After the robbery, they left the bank, with the Defendant driving the van. They drove to another location,

following Travier's directions, where there was a white Toyota Camry with another driver waiting for them. They exited the van and entered the white car.

At the time of the court hearing, the FBI had initiated a policy to record interviews, but that was not the policy at the time of the interview. The interview room was not equipped with recording equipment at the time of the interview, but it is today with the implementation of the new policy. At the time of the Defendant's interview, the FBI's default position was not to record interviews, and special permission had to be obtained to record an interview.

Stewart had previously recorded interviews in other cases. However, he had not made arrangements ahead of time to record the Defendant's interview because the Defendant's interview was unforeseen. Testimony indicated that at the beginning of the day, Strayer simply went to check addresses and conduct spot surveillance. Moreover, Stewart did not have probable cause to arrest the Defendant, and had the Defendant refused to talk with the officers, Stewart would have instead walked away. Thus, at the beginning of the day, Stewart did not know whether the officers would see the Defendant, and if so, whether the Defendant would agree to talk with the officers.

The interview lasted approximately two hours. After the interview, the Defendant was concerned about when he would be arrested, as he had a family and would need to arrange his affairs. Stewart said it would likely be one to two weeks before the issuance of an arrest warrant. The Defendant agreed that he would turn himself in when the time came, and furnished a phone number for Stewart to reach him. Stewart assured the Defendant that he would have some time to arrange his affairs, but probably not long. The Defendant accepted the officers' offer to give him a ride back, and the officers dropped the Defendant off at the corner of McKinnie and Lafayette, as the Defendant requested.

The Defendant was not handcuffed or otherwise restricted at any point during the July 23, 2013, encounter and interview. He was allowed to keep his cellphone and other personal effects on his person. The Defendant was in the continuous presence of at least one of the officers over the course of the encounter, from initial pickup until the officers dropped him off after the interview. *Miranda* warnings were not given to the Defendant at any point during the encounter.

On May 1, 2014, Stewart spoke with Assistant United States Attorney Lesley Miller Lowery, about his interview of the Defendant on July 23, 2013. At that time Lowery was handling the case. Strayer met with Lowery along with Stewart. After the meeting with Lowery, Lowery gave Stewart a copy of her notes that she took while speaking with Strayer and Stewart. Lowery requested that Stewart prepare a 302 report to document the details surrounding the interview. Because Lowery asked detailed questions, Stewart wanted a framework to begin drafting the document. He wanted to make sure he hit the "big ticket items." Stewart had already prepared a 302 report pertaining to the interview conducted on July 23, 2013. That report was limited to what the Defendant allegedly said about the robbery. Lowery was asking for a 302 report that documented how the Defendant was identified, the details surrounding his ride to the office, and other things outside of what the Defendant directly told Stewart. Stewart and Strayer used Lowery's notes to prepare the 302 report. Lowery wanted to know as closely as possible the words that were used when the Defendant was picked up and the words used pertaining to the comment that he "was not being [placed] under arrest unless he told us something about murder or something like that." (Tr. 29.) Stewart thought about Lowery's request and about the exact words he used pertaining to the Defendant leaving the FBI's office that day or not. Stewart remembered that "she was very keyed in on that phrase, and I wanted to make sure that what I was surmising was as close to accurate as possible." (*Id.*)

In Lowery's notes, she wrote that Stewart told her he had said to the Defendant that: "Unless you tell me you killed someone, you're walking out of here at the end of this/at the end of this, you're going home". (Tr. 30.) In Stewart's May 19, 2014, 302 report after the meeting with Lowery, Stewart wrote that he told the Defendant "unless he confessed to a murder, he would be leaving the office and was not under arrest." (Tr. 31.)

Before testifying in this matter, Stewart listened to a recorded noncustodial interview he did on May 1, 2013, of a different defendant in another bank robbery case. Stewart told that defendant "[o]kay. So understand something before we start asking you questions, okay? No matter what you tell us right now, unless you tell us you did something just out of this world criminal that I can't let you leave here for, you're going to walk out of this office today, okay? Not putting any handcuffs on you or anything like that." (Tr. 85.)

Stewart testified that he told the Defendant "if he had murdered somebody, that would rise to the level of me not allowing him to leave. Anything less than that, he would leave the office that day." (Tr. 86.)

When asked whether he stated to the Defendant that "[u]nless you tell me you've murdered someone . . . [y]ou can leave here when we're done, or words to that effect?" (Tr. 87.) Stewart stated, "[n]o, I – I don't – the different ways I've used that theme before, don't typically end with 'when we're done.'" (*Id.*) Stewart was then asked how about "when we're finished?" Stewart replied "[p]ossibly." (*Id.*)

A line-by-line review of the notes taken by Stewart during his interview of the Defendant on July 23, 2013, reveals that nothing was written down concerning the encounter between Stewart, Strayer, and the Defendant prior to the start of the interview. Those notes do not discuss the pickup of the Defendant, the pat down and visual inspection for weapons, the trip to the FBI

office, the physical aspects of the interview room, or the alleged promise that short of murder or some type of crime at that level the Defendant would be released that day. The source of information for Stewart's May 19, 2014, 302 report all stem from the memories of Stewart and Strayer. In writing the report, Stewart relied upon "our recollection and we used Assistant United States [Attorney] Miller-Lowery, her written notes, which, again, were words and notes that she copied down from our mouths during the May 1st meeting." The May 19, 2014, 302 report was written approximately ten (10) months after the July 23, 2013, interview and after the Defendant's Second Motion to Suppress had been filed. At the time Stewart drafted the 302 report he knew that a motion to suppress had been filed and the basis of that motion.

## LEGAL STANDARD

In *Miranda*, the Supreme Court "held that the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). However, because not every conversation with the government imperils this privilege, the government can still obtain statements from a defendant in a conversation without them being excluded simply due to the fact that they preceded *Miranda* warnings. *Id.* Rather, "the concern in *Miranda* was the inherently coercive nature of custodial interrogation." *Id.* Therefore, "a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.* (citing *Berkemer*, 468 U.S. at 428; *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)).

The Defendant alleges that the Court should suppress his statements because he was subjected to custodial interrogation without receiving *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). The parties agree that the Defendant was subjected to interrogation; thus, the sole issue before the Court is whether the Defendant was in custody.

"A person is 'in custody' for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Id.* (citing *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2402 (2011); *United States v. Podhorn*, 549 F.3d 552, 556 (7th Cir. 2008)). The analysis is an objective one whereby the court asks how a reasonable person in the suspect's position would have understood the situation. *Id.* ("Neither the subjective views of the suspect being questioned nor that of the officer engaging in the questioning is considered.") To make that determination, the court must consider "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 131 S.Ct. at 2402; *Podhorn*, 549 F.3d at 556. Thus, "[a] suspect is in custody for purposes of *Miranda* if, based on a totality of the circumstances, a reasonable person in the suspect's position would not have believed he was free to leave. *United States v. Johnson*, 680 F.3d 966, 973–74 (7th Cir. 2012).

While not an exhaustive list, the Seventh Circuit has identified a list of factors that a court should consider in determining whether a person should be considered in custody, including whether:

(1) the encounter occurred in a public place;

(2) the suspect consented to speak to the officers;

(3) the officers informed the individual that he was not under arrest;

(4) the individuals were moved to another area;

(5) there was a threatening presence of several officers and a display of weapons or physical force;

(6) the officers deprived the suspect of documents needed to depart; and

(7) the officers' tone of voice was such that their requests would likely be obeyed.

*Ambrose*, 668 F.3d at 956; *Barker*, 467 F.3d at 629; *United States v. Wyatt*, 179 F.3d 532, 535 (7th Cir. 1999).


## ANALYSIS

The parties agree that the sole issue is whether the Defendant was in custody during the July 23, 2013, interview with Stewart and Strayer. The parties further agree that the list of seven factors, as noted above, should be analyzed to determine whether, under the totality of the circumstances, the Defendant was in custody.[2]


### A.      Whether the Encounter Occurred in a Public Place

The Defendant argues that the encounter did not occur in a public place. While the encounter was initially in a public place, the Defendant contends that it's public portion was short in duration, lasting only the time necessary to stop the Defendant, require him to show his hands and waistline, be frisked and placed into the car before being taken to the FBI office and physically separated from the public. The Defendant argues that the public portion of the encounter ended once the Defendant was placed in the police car, and to say the encounter occurred in a public place ignores the seclusion in the car ride and several hours spent in the conference room at the FBI office.

---

[2] As for the sixth factor concerning whether the officers deprived the suspect of documents needed to depart, the parties agree that this factor in inapplicable to the facts of this case.

The Government argues that the encounter with the Defendant occurred in a public place, with several people on a porch witnessing Strayer approach the Defendant after he had walked several blocks to the driveway at 3409 Holton.

Unquestionably, the initial encounter occurred in a public place. Strayer and Stewart approached the Defendant in a driveway after observing him walking down Holton Avenue. The record reflects that the officers desired to keep the encounter low-key and discuss the bank robbery with the Defendant, which they hoped to do back at the FBI office. When asked, the Defendant consented to going to the FBI office to talk with the officers. The conference room in the FBI office where the interview transpired is not a public place, but the Defendant was not detained and compelled to be there by the officers. The overall encounter occurred in both public and nonpublic places, and the shift from a public place to a nonpublic place brings the other factors of the analysis into sharper contrast.

**B.      Whether the Suspect Consented to Speak to the Officers**

The Defendant argues that while he consented to speak with the police, it was predicated upon a ruse because Stewart told the Defendant that he wanted to clear the Defendant's name, although his true intention was to obtain incriminating statements. The Defendant contends that his consent is based on a lie that precipitates the entire action and that, based on the Defendant's request for a lawyer in a subsequent interview in August 2013, the Defendant would have asked for a lawyer had the officers told him their true intentions. According to the Defendant, this lie propagated by Stewart renders the Defendant's consent invalid.

The Government argues that the Defendant consented to speak with the officers. It contends that Stewart asked the Defendant if he was willing to accompany the officers to their

office to discuss the bank robbery and clear his name because his name kept coming up in the investigation, and that the Defendant willingly agreed to do so. The Government argues that the officers would not have detained the Defendant if he had refused to talk, and that the small ruse of asking the Defendant to talk with them and clear his name is insufficient to overcome the Defendant's consent.

The Court is persuaded that the Defendant's consent was valid here. First, there is no requirement that an investigating officer must be absolutely truthful when questioning a suspect. *See, e.g.*, *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.") In *Kontny*, the Court of Appeals acknowledged that in custodial as well as noncustodial interrogations the law permits the police to pressure and cajole, to actively mislead, and to conceal material facts. *Id.* at 817–18. The issue is whether the Defendant was prevented from making a rational decision on his own free will to communicate with the officers. *See, e.g.*, *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000) ("a confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will"); *United States v. Westbrook*, 125 F.3d 996, 1006 (7th Cir. 1997) ("nothing in this record leads us to believe the agents misled him or exploited Mr. Westbrook's anxiety to the point that he was unable to make a rational decision about whether to confess").

Certainly the desire to clear his name might have compelled the Defendant to discuss the bank robbery at the FBI Office, but this desire, even if generated through a ruse, does not

overcome the Defendant's voluntary act. The initial encounter in public was short, where Stewart indicated he wished to talk and specifically asked the Defendant, prior to the Defendant entering the car, whether he was coming with them voluntarily. The officers did not cajole or apply pressure to convince the Defendant to participate. Rather, they simply stated that they wanted to talk to clear things up, and the Defendant voluntarily consented to getting in the car and speaking with the officers at the FBI office. The Defendant's decision to speak with the officers was "'not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). The Court finds that the Defendant consented to speak with the officers at the FBI office.

**C.    Whether the Officers Informed the Defendant that he was not under Arrest**

The Defendant argues that nobody ever informed him that he was not under arrest. The Defendant lays out seven different versions of what Stewart might have said to the Defendant, and argues that the word "arrest" was not used in any of them. In particular, the Defendant argues that the most credible version of what Stewart said to the Defendant implied that the Defendant could not leave until the officers finished or ended the interview.[3] The Defendant contends that, under the totality of the circumstances, a reasonable person would not have believed he was free to leave because he had to stay until the officers had finished questioning him.

The Government argues that the officers' statements to the Defendant conveyed to him that he was not under arrest. Although Stewart did not use the precise words "You are not under

---

[3] The Court finds it unnecessary to address each of the seven versions suggested by the Defendant. Rather, the Court will conduct its analysis using the version the Defendant argues is the most credible.

arrest," the Government argues that Stewart's question to the Defendant that he wanted to be sure that he was coming with them voluntarily, posed before the Defendant entered the unmarked car, and the Defendant's response acknowledging that he was coming voluntarily, establishes that the Defendant understood he was not under arrest. Additionally, the Government contends that Stewart asked if the Defendant was willing to come to the office, rather than demand so, and that the Defendant sat in the front seat of the car, was never handcuffed or had his freedom of movement restricted, and was not thoroughly searched, as he would have been had he been arrested.

The record shows that the precise words "You are not under arrest" were not said to the Defendant. Although the Defendant argues that a reasonable person would not feel free to leave and end the interrogation, the Court agrees with the Government that the essential meaning that the Defendant was not under arrest was conveyed to him. Roughly halfway through the interview Stewart accused the Defendant of the bank robbery and then informed him that unless he told Stewart he had committed murder or something like it, he would be going home at the end of the interview. After that, the Defendant allegedly confessed to his role in the robbery. The Defendant consented to speak with Stewart and Strayer, and Stewart confirmed before the Defendant entered the car that he was coming voluntarily. When Stewart asked to do a quick check for weapons, the Defendant assumed a posture commonly used for a search incident to arrest, but Stewart told him that such a search was unnecessary, and instead, he was asked to raise his shirt to show that he was unarmed. A reasonable person in the Defendant's situation would not believe he was under arrest or was unable to leave at this point in the encounter. The Seventh Circuit has previously rejected the argument that a reasonable person subject to a pat-down search would not feel free to leave. *United States v. Wyatt*, 179 F.3d 532, 536 (7th Cir. 1999);

*United States v. Yusuff*, 96 F.3d 982, 988 (7th Cir. 1996). The Defendant had the opportunity to decline speaking to the officers. There is no evidence in the record suggesting that the Defendant's free will was overcome as a result of "physical abuse, psychological intimidation, or deceptive interrogation tactics." *Richardson*, 657 F.3d at 525. Rather, the Defendant exercised his free will when he decided to speak with the officers and potentially clear his name. Several courts have held that a suspect who voluntarily chooses to go to a police station for questioning is not, by the nature of that fact alone, in custody for *Miranda* purposes. *See, e.g.*, *United States v. Budd*, 549 F.3d 1140, 1145–46 (7th Cir. 2008) (finding that security requirements requiring a suspect to have an escort to move throughout the building did not transform his noncustodial voluntary interview into a custodial one when he agreed to go to the police station to be interviewed);

The Court finds that a reasonable person in the Defendant's situation would not believe that he was under arrest.

**D.      Whether the Defendant was Moved to Another Area**

The fourth factor, whether the Defendant was moved to another area, is clearly applicable under these facts. The Defendant argues that he was not only moved, but that his purported consent to be moved was actually an acquiescence to authority based upon the officers' show of force during the initial encounter; specifically, the officers' acts of showing their credentials and Strayer's showing and placing his hand on his weapon.

The Government argues that although the Defendant was moved from the driveway at 3409 Holton Avenue to the FBI office, he willingly agreed to come to the office, as confirmed by

Stewart's question to the Defendant that he wanted to be sure the Defendant was coming with them voluntarily before the Defendant entered the car.

Stewart testified during the evidentiary hearing that he would not transport a bank robbery suspect without checking him for weapons first, a statement the Defendant contends contradicts Stewart's testimony that the Defendant was not under arrest. The Court is unpersuaded by this argument. The Defendant was a suspect in an armed bank robbery. The Court finds that it is rational for an officer, when encountering such a suspect, to verify that the Defendant is unarmed for officer safety. The Defendant argues that the officers did not have an articulable suspicion that the Defendant was armed and dangerous when they patted down his pockets and asked him to show his waistband to prove he did not have a weapon. However, as a suspect for an armed robbery, it is rational for the officer to believe that the Defendant might be carrying a weapon.

The Defendant argues that "[i]n terms of a search, (as opposed to mere transportation), an acquiescence to authority is insufficient to demonstrate consent." Def.'s Reply 5, ECF No. 76 (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983)). According to the Defendant, the initial show of force transforms the voluntariness of any consent into mere acquiescence to authority. However, the interchange to assure the officers that the Defendant was not armed was brief, and the officers did not force the Defendant to come to the FBI office; rather, they let him know his name kept coming up in their investigation and they wanted to talk about it. They then confirmed before departing for the FBI office that the Defendant was coming voluntarily. The Court has already discussed the consent factor, and the facts relay that, although the Defendant was moved to the FBI office, he joined the officers voluntarily.

**E.       Whether There was a Threatening Presence of Several Officers and a Display of
         Weapons or Physical Force**

The fifth factor concerns whether there was a threatening presence of several officers and

a display of weapons or physical force. The Defendant argues that the facts clearly demonstrate

that a threatening show of force precipitated the Defendant going with the officers to the FBI

office. The Defendant argues that it is uncontested that Strayer had his hand on his weapon,

visible to the Defendant, at the initial encounter and that the pat down and order to lift his shirt

revealed that the Defendant was unarmed. The Defendant argues it is of no consequence that

Strayer removed his hand from his gun and let his shirt fall after the officers confirmed that the

Defendant was unarmed, because from that point on the Defendant knew the officers were

armed. The Defendant contends that it was immediately after this show of force that the

Defendant was transported to the FBI office, where he was never allowed to be alone.

The Government argues that there was no threatening display of force or threatening

presence of several officers in this case. The Government contends that two officers in casual

dress and unmarked vehicles is not a show of force, and that although the officers were armed,

they did not draw or display their weapons in a threatening manner. The Government argues that

law enforcement officers have a legitimate need to display weapons at the outset of an encounter

to ensure safety until the officers can ascertain that the person encountered is unarmed.

Therefore, the Government contends, the fact that Strayer removed his hand from his weapon

and let his shirt fall once it was determined the Defendant was unarmed demonstrates that the

officers only took the minimal precaution for safety.

Although Strayer initially displayed his gun to the Defendant, once he and Stewart were

assured that the Defendant was unarmed he removed his hand from his gun, let down his shirt,

and did not reach for it again. "Several courts have ruled that an initial display of guns, subsequently reholstered, does not result in 'custody' that requires *Miranda* warnings." *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (collecting cases). "The confrontational nature of [the defendant's] initial encounter with the officers does not, by itself, establish custody." *United States v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). In *Jones*, the Court of Appeals noted that an officer's display of a gun was important for assessing the overall situation, but was not outcome determinative that the suspect was in custody. *Id.* Here, the Defendant argues that his awareness that the officer was still armed, even after the initial encounter, was threatening, but based on the totality of the circumstances the Court finds that a reasonable person would not feel threatened by the mere knowledge that the officer is armed. Further, only two officers were involved with the Defendant throughout the encounter, which did not amount to a threatening presence of several officers. *See, e.g.*, *Berkemer*, 468 U.S. at 438–39; *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010); *Cruz*, 255 F.3d 83–84.

**F.      Whether the Officers' Tone of Voice was such that Their Requests would likely be Obeyed**

Finally, the Defendant argues that Strayer's statements to the Defendant to show his hands, with his hand on his weapon, and Stewart's request that the Defendant raise his shirt to show he did not have a weapon were more than a mere suggestion.

The Government argues that the tone and demeanor of the officers were not threatening or compulsive. But for Strayer's initial directive to the Defendant to show his hands, the entire encounter was calm and nonthreatening. The Government argues that the interaction was

deliberately calm and unintimidating, since the officers wanted to keep their meeting low-key, and that an initial display of force until officers can be assured that a suspect is unarmed is not only understandable, but it excused in the *Miranda* context.

It is undoubtedly true that the officers' statements asking the Defendant to raise his shirt were made to assure them that the Defendant was unarmed and that the officers meant for it to be obeyed. However, the record reflects that Stewart told the Defendant that he didn't need to place his hands on the car to be searched for weapons. Stewart told him "Don't do all that," and asked the Defendant to just raise his shirt to expose his waistband to verify he was unarmed. These requests for the Defendant to verify he was not armed are different from the officers' request that the Defendant talk with them about the bank robbery. They asked the Defendant and he consented to come with them to talk downtown. Then, before entering the car, Stewart told the Defendant that he needed to ensure that the Defendant was unarmed for officer safety, and Stewart testified that he would not transport a suspected bank robber without verifying that he was unarmed first. While it is likely that Stewart's tone of voice was such that it was likely that the Defendant would obey his requests to show that the Defendant did not have a weapon, nothing in the record indicates that his tone of voice for the other requests rose to the same level. The officers' testimony, which the Court finds credible, was that they wanted to keep things low-key and deliberately calm and unintimidating in an effort to encourage the Defendant to talk with them. Stewart confirmed that the Defendant was coming voluntarily before the Defendant entered the front passenger seat and rode with Stewart and Strayer to the FBI office. Although the officers wanted the Defendant to comply with these requests, because they wished to talk with him, there is nothing in the record to suggest that their tone of voice or words made it likely

that the Defendant would obey those requests against his own free will. Rather, he voluntarily consented to join the officers and participate in the interview.

In consideration of the parties' arguments and the evidence presented in this case, the Court finds that, based on a totality of the circumstances, a reasonable person in the Defendant's position would have believed he was free to leave, and therefore the Court finds that the Defendant was not in custody for purposes of *Miranda*. *See Johnson*, 680 F.3d at 973–74. The evidence shows that the Defendant consented to speaking with the officers at the FBI office, a decision that was "the product of [his] rational intellect and free will." *Richardson*, 657 F.3d at 525. The record is devoid of evidence of physical abuse, psychological intimidation, or deceptive interrogation tactics that would overcome the free will of a reasonable person in the Defendant's situation. *See id.* The sole issue the Defendant has challenged in his motion to suppress is the lack of *Miranda* warnings during his July 23, 2013, interview, which the Defendant argues were necessary because he faced a custodial interrogation. Because the Court finds that the Defendant was not in custody during his interrogation, and because "a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required," *Ambrose*, 668 F.3d at 954, the Defendant's Second Motion to Suppress will be denied.

## CONCLUSION

For the foregoing reasons, the Defendant's Second Motion to Suppress [ECF No. 45] is DENIED.

SO ORDERED on February 21, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
